**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

SHAWN P. ARMSTRONG,

:

Petitioner, Case No. 3:06-cv-087

: District Judge Walter Herbert Rice

-vs- Chief Magistrate Judge Michael R. Merz

WANZA JACKSON, Warden,

:

Respondent.

---

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

---

This habeas corpus case is before the Court on Petitioner's Objections (Doc. No. 52) to the Magistrate Judge's Substituted Report and Recommendations (Doc. No. 50) recommending that the Petition be dismissed with prejudice as procedurally defaulted in the Ohio courts. The General Order of Reference for the Dayton location of court permits a magistrate judge to reconsider decisions or reports and recommendations when objections are filed and reconsideration is appropriate here, given the seventy-three page length of the Objections which have sixty pages of exhibits attached.

### Allegation of Bias

The Magistrate Judge is advised by separate correspondence that Petitioner has been assisted in this case by William E. Martin, a fellow inmate. Mr. Martin believes the Magistrate Judge is biased against Petitioner because he also believes that another inmate at Lucasville, Daniel Greenley, had implicated Armstrong in a crime but later recanted and apologized, thus somehow

making Greenley's interests coincide with those of Petitioner. Allegedly Mr. Greenley burglarized a judge's home and Mr. Martin believes it was the Magistrate Judge's home and therefore the Magistrate Judge is biased against Greenley and. derivatively, Armstrong (See Doc. No. 53). There is no truth to these suppositions in that the Magistrate Judge's home has not been burglarized by Mr. Greenley, nor to the best of my recollection have I ever had any acquaintance with Mr. Greenley or known of any relationship between him and Mr. Armstrong.

## Analysis

## The Facts of the Underlying Case

Petitioner has pled ten separate grounds for habeas corpus relief in various pleadings. In the Substituted Report and Recommendations, the Magistrate Judge found all of these grounds for relief to have been procedurally defaulted in the state courts and that Petitioner had shown neither excusing cause and prejudice nor "actual innocence" to as to excuse the defaults. The Substituted Report and Recommendations concludes with the recommendation that this case be dismissed with prejudice and Petitioner be denied a certificate of appealability (R&R, Doc. No. 50, at 15.)

The first twenty-one pages of the Objections are devoted to Petitioner's Statement of Facts which he asserts overcomes the presumption of correctness. 28 U.S.C. §2254(e)(1) as adopted by the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing

evidence.

Under §2254(e)(1), a state court's findings of fact are presumed correct and may be rebutted by the petitioner only by clear and convincing evidence to the contrary. *Mitchell v. Mason,* 325 F.3d 732, 737-38 (6th Cir. 2003); *Warren v. Smith,* 161 F.3d 358, 360-61 (6th Cir. 1998). This statutory presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records. *Girts v. Yanai,* 501 F.3d 743, 749 (6th Cir. 2007); *Mason v. Mitchell,* 320 F.3d 604, 614 (6th Cir. 2003); *Brumley v. Wingard,* 269 F.3d 629, 637 (6th Cir. 2001), citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981). Petitioner recognizes the applicability of this standard when he states "Petitioner now sets forth the facts in this case, using the trial transcript and exhibits to rebut the presumption of correctness with clear and convincing evidence." (Objections, Doc. No. 52, at 2.)

The underlying facts as found by the Ohio Court of Appeals are as follows:

> On March 21, 2002, Donald Williams was outside of his home in Huber Heights when he saw a black minivan in his driveway. He noticed a woman in the passenger seat of the van. Williams then came upon an individual trying to "jimmy" the lock on the front door of the residence. Upon being questioned by Williams, the individual stated that he was there to do some work for a person whose name Williams could not recall at the time of trial. Williams informed the individual that he had the wrong house. Williams watched as the individual left in the van. Williams then called the police and reported the incident and the license plate number of the van.
>
> Officers from the Huber Heights Police Department responded to a dispatch regarding Williams' report. Officers located the van at the home of Katherine and Gary Abney, just down the road from the Williams residence. The officers attempted to prevent the van from leaving, but the driver drove through the Abney's yard onto the road and began fleeing from the police at high speed on several different roads and highways. The van eventually ran into a traffic sign and crashed.

It was determined that the van belonged to Steven Terhune and that it had been stolen from Terhune's place of work. It was also determined that the Abney's residence had been burglarized. The driver of the van fled into a wooded area and eluded capture. The passenger, Angelica Stephens, was arrested. Stephens appeared as though she were barely able to stay awake. She told Huber Heights Detective Mike Noll that the driver was a white male named "Shawn." She also stated that Shawn had a tattoo on his abdomen and that he went by the street name of "J." Finally, she gave a description of the clothes that Shawn had been wearing.

Detective Noll and Detective Tom Milligan were assigned to investigate the identity of the driver. They gathered photographs of white males named Shawn with whom the police had had prior encounters. Angelica Stephens picked out a picture of an individual named Shawn Plessinger as the perpetrator. n1 The police then took the photographs and showed them to people in the areas where they believed Plessinger spent time. Teddie Skinner was one of the people to whom the photographs were shown. Several people told the police that Plessinger's photograph looked the most like the man known as Shawn, or “J.”

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 According to the police, at the time Angelica chose the picture of Shawn Plessinger, she was still in a very lethargic state as a result of being in a self-described “crack coma.”

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The police then put together a photographic array that included Plessinger's photograph. From that array, Huber Heights police officer Victor Oakes identified Plessinger as the man who eluded the police. However, he noted that the individual who eluded the police had facial hair and longer hair not depicted in the Plessinger photo. The photographic array was show to Donald Williams, but he did not identify anyone. Thereafter, a warrant was issued for Shawn Plessinger.

Later, Detective Noll received an anonymous telephone call informing him that the "Shawn" that the police were looking for was in Grandview Hospital, under guard, in the custody of the Dayton Police Department. Upon arriving at the hospital, they found Shawn Armstrong in a room, under guard. He was unconscious. A hospital security guard lifted up Armstrong's gown to reveal a tattoo on his

> abdomen that said "money and love" in large lettering. The police took pictures of Armstrong's face and abdomen. They also realized that they had mistakenly taken out a warrant for Plessinger and promptly caused that warrant to be rescinded.
>
> The pictures of Armstrong's tattoo were shown to Angelica Stephens, who recognized it as the same tattoo that the Shawn driving the van from the burglary scene had had on his abdomen. A photographic array was put together, with Armstrong's picture included. That array was then shown to Stephens and Skinner, who both identified Armstrong as the Shawn in question. Skinner then gave a written statement to the police and indicated that she knew Armstrong through one of her friends. She stated that she knew that Armstrong had spoken about eluding the police and lying in a creek bed for a couple of hours while police were searching for him. She also said that Armstrong had muddy clothing in her home.

*State v. Armstrong*, 2005 Ohio App. LEXIS 482.(Ohio App. 2nd Dist. Jan. 31, 2005)(copy at Exhibit 20 to Return of Writ, Doc. No. 34).

Petitioner does not attempt to rebut the fact that a burglary was committed at the Abney home and that the white male perpetrator fled in a black minivan in which Angelica Stephens was a passenger. The van crashed while being pursued and the perpetrator escaped, although Ms. Stephens was arrested. The critical question is whether Petitioner Shawn Armstrong was the perpetrator. In attempting to show that he was not, Petitioner points to the following evidence:

1. Donald Williams, who caught the perpetrator trying to break into his home, estimated the perpetrator’s height at 5'4" whereas Petitioner was measured at trial as standing 5'10" or 5'11".

2. A number of people identified the burglar as one Shawn Plessinger, including Angelica Stephens, Teddie Skinner, and Huber Heights police officer Oakes who was familiar with Plessinger as a burglar in the Huber Heights area. The first intended victim, Donald Williams, apparently made at least a tentative identification of Plessinger. The Montgomery County Prosecutor apparently opened a case on Plessinger and a warrant was issued for his

arrest.

3. The crime in Huber Heights occurred March 21, 2002. On March 25, 2002, Petitioner was in a foot chase with the Dayton Police which resulted in his losing consciousness and being transported and kept in custody at Grandview Hospital in Dayton. On March 29, 2002, before Plessinger was apprehended, Huber Heights Detective Noll received an anonymous tip that the "Shawn" he was looking for was at Grandview Hospital. He and Detective Colvin proceeded to the hospital where Petitioner was still unconscious. They took a photograph of his abdomen which contains a tattoo with the words "Money and Love" in large script.

4. Detectives Noll and Colvin both testified that this tattoo was consistent with the description of a tattoo on the abdomen of the perpetrator given by Angelica Stephens on March 21, 2002, when she was arrested. Having been shown the photograph taken of Petitioner's abdomen, Angelica Stephens identified it as the tattoo in the abdomen of the perpetrator. Petitioner asserts, without any record reference that Stephens could see his face in the photograph of the tattoo. This, he asserts, vitiates her identification of him from a photograph of his face she was shown after she had identified the tattoo. Petitioner asserts that he and Plessinger looked alike at the time, but a photograph of Plessinger was omitted from the photospread from which Stephens identified Petitioner.

5. Teddie Skinner gave a second statement to the Huber Heights police in which she identified Petitioner and testified about muddy clothing he left at her house and which she washed, although she had previously identified Plessinger. Petitioner claims Skinner is a "professional witness" for Detective Knoll.

6. Tina Farler, with whom Petitioner had been living for about two to three weeks before the crime, was to have been his alibi witness. However, according to Petitioner, she perjured

herself by incriminating him in order to maintain her diversion from a five-year sentence at Marysville to the Monday program. Petitioner asserts that Farler had to have been offered a deal – which included her perjuring herself to Petitioner's disadvantage – because, Petitioner asserts, she would not otherwise have been eligible for Monday. According to Petitioner, both Farler and Detective Noll perjured themselves about Farler's testimony in the case.

Petitioner's theory of why so many police officers and lay witnesses committed and/or suborned perjury in this case is "It is absolutely clear that Petitioner was framed to cover up the malfeasance of Dayton officers Orndorff and Carlson when they beat Petitioner into a coma." (Objections, Doc. No. 52, at 21.)

The Magistrate Judge concludes that Petitioner has not overcome by clear and convincing evidence the presumption of correctness which attaches to the state court findings. Petitioner's theory depends upon Dayton Police Officers Orndorff and Carlson deciding between themselves that they needed to cover up the facts of their arrest of Armstrong and agreeing to do it by substituting him for another man named "Shawn" being sought by Huber Heights Police, despite the fact that Orndorff and Carlson were subject to a Dayton Police internal affairs inquiry because of the use of force in arresting Armstrong. Once Orndorff and Carlson thus conspired, they had to bring at least two Huber Heights detectives into the conspiracy and persuade them to give up a case against Shawn Plessinger, as to whom they had already established probable cause and obtained an arrest warrant. Further collusion was required from the Montgomery County Prosecutor's Office, which had already approved the charges against Plessinger. Petitioner's theory thus requires a conspiracy among a large number of public officials, all acting in concert without any motive other than to protect Orndorff and Carlson, all themselves risking indictment for obstruction of justice or worse. Such a conspiracy is highly unlikely; in any event, Petitioner has not proved it by clear and convincing

evidence.[1]

Further difficulty for Petitioner's theory lies in the tattoo. How many young white males in the Dayton, Ohio, area have "Money and Love" tattooed in large script letters across their stomachs? There is no evidence that Shawn Plessinger does[2].

**Procedural Default Analysis**

After Petitioner's conviction was affirmed by the Court of Appeals on direct appeal, he failed to timely appeal to the Ohio Supreme Court. However, about two weeks after his time to appeal expired, he sought and received leave to file a delayed direct appeal. However, he missed the June 24, 2005, deadline for filing his memorandum in support of jurisdiction and the Ohio Supreme Court dismissed the delayed appeal.

In the Substituted Report and Recommendations, the Magistrate Judge concluded that the first nine Grounds for Relief were barred by Petitioner's failure to timely present them to the Ohio Supreme Court on his delayed appeal.

Because he tendered the memorandum to the prison mailroom on June 22, 2005, Petitioner argued that his filing was timely because it was deposited with prison authorities before the due date under the "mailbox rule". The Substituted Report and Recommendations noted that Ohio has refused to adopt the mailbox rule. *State, ex rel Tyler, v. Alexander*, 52 Ohio St. 3d 84 (1990)(noting

---

[1]Petitioner claims that Officer Orndorff has a pattern of assaulting citizens and then obtaining assistance from corrupt fellow officers to "whitewash his malfeasance," referring to Case No. 3:00-cv-587. That case was dismissed with prejudice on stipulation of the parties on October 31, 2001, without any findings or hearing.

[2]There was some hearsay testimony at the motion to suppress hearing that Plessinger may have some tattoo on his stomach; no content was testified to.

that *Houston* is not a constitutional decision and finding its logic unpersuasive.) Furthermore, it noted that the Sixth Circuit has held that the prisoner mailbox rule is not binding on the States. *Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003); *Adams v. LeMaster*, 223 F.3d 1177, 1183 (10th Cir. 2000). In the Objections, Petitioner argues at length that Ohio used to follow the mailbox rule, that some Ohio courts still do, and that considerations of due process and access to the courts suggest the federal courts should require the States to follow it (Objections, Doc. No. 52, at 30-35). However, Petitioner presents no authority suggesting *Maples v. Stegall, supra,* is not binding precedent on this Court.

Petitioner's tenth[3] Ground for Relief had a different procedural route. That claim reads:

> **Ground Nine:** The Sentence should be reduced because there is a presumption against having consecutive sentences for multiple crimes growing out of the same incident exceeding the maximum penalty for the most serious offense.

(Quoted in R&R at 3.) In the Substituted Report and Recommendations, the Magistrate Judge concluded this claim was procedurally defaulted because he understood that Petitioner admitted the first time he attempted to present this claim to the Ohio Supreme Court was in his second attempt at a delayed direct appeal. (See Motion for Leave of Court to Supplement the Second Amended Petition, Doc. No. 39, at 2). Because the Ohio Supreme Court does not allow a second delayed direct appeal in felony cases and it enforced that rule against Petitioner and that is an adequate and independent state ground of decision, the Magistrate Judge found this claim also procedurally defaulted.

Petitioner objects that in fact he initially raised this claim in his Motion for Reconsideration under Ohio App. R. 26(A). In that Application, Petitioner adverted to his Ninth Assignment of Error on direct appeal which read:

---

[3]This Ground for Relief is numbered "9" in the Report and Recommendations because Petitioner had two Grounds for Relief numbered "4."

> The sentence should be reduced because there is a presumption against having consecutive sentences for multiple crimes growing out of the same incident exceeding the maximum penalty for the most serious offense.

(Application for Reconsideration, Ex. 21 to Return of Writ, Doc. No. 18.) When the direct appeal and Motion for Reconsideration are read together, it is clear that Petitioner first raised this claim on direct appeal. All that happened in the Motion for Reconsideration was that Petitioner argued he was entitled to a different result on the Ninth Assignment of Error on the basis of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), and *State v. Bruce*, 2005 Ohio App. LEXIS 346 (Ohio App. 1st Dist Feb. 4, 2005). *Booker* had been decided about nineteen days before the Second District Court of Appeals decided this case; *Bruce* was decided about four days about five days after the decision in this case. The Second District did not offer any analysis of either case in deciding not to reconsider its decision. (Opinion, Ex. 22 to Return of Writ.)

The trial judge here had imposed consecutive sentences and maximum sentences upon his making the required determinations under Ohio Revised Code § 2929.14. In February, 2006, more than a year later, the Ohio Supreme Court decided that *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L. Ed. 2d 403 (2004), renders the Ohio sentencing scheme embodied in Ohio Revised Code § 2929.14 unconstitutional because it permits enhanced sentences upon findings by a trial judge rather than a jury. *State v. Foster*, 109 Ohio St. 3d 1, 845 N.E. 2d 470 (2006). *Booker* decided the federal Sentencing Guidelines were unconstitutional if held to be mandatory and added nothing to the analysis of state law found in *Blakely*. Thus the Second District Court of Appeals was not incorrect in concluding that *Booker* did not require them to reconsider their decision. Of course, being a court of coordinate authority, they were not obliged to follow *Bruce*. As explained in the Substituted Report and Recommendations, this claim was properly made under *Blakely*.

In any event, Petitioner's Tenth Ground for Relief was in fact first presented as his Ninth

Assignment of Error on direct appeal. This leads to the conclusion that it is procedurally defaulted for the same reason as his first nine Grounds for Relief, to wit, his failure to file a timely memorandum in support of jurisdiction in the Ohio Supreme Court on delayed direct appeal.

The Objections make a lengthy argument on the merits of Petitioner's claims which the Magistrate Judge does not reach, since all claims are procedurally defaulted.

Petitioner also made a lengthy argument that he is actually innocent and that his actual innocence excuses his procedural default. In the Substituted Report and Recommendations, the Magistrate Judge noted that

> To come within the actual innocence exception to the required showing of cause and prejudice with respect to an abuse of the writ, a habeas petitioner must show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. That is, the petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt' in the light of the **new evidence** he or she is tendering. In reaching this conclusion, the habeas court may need to make credibility determinations. *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L.Ed.2d 808 (1995). Petitioner here does not submit any new evidence of actual innocence. Instead, he argues with the jury's conclusion that the evidence actually presented at trial shows he is not guilty. But an actual innocence claim requires the production of new evidence, not the rearguing of old. See *House v. Bell*, 547 U.S. ___, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

(Substituted Report and Recommendations, Doc. No. 50, at 13-14).

Petitioner objects that he now has offered new evidence of his actual innocence, adverting to the various exhibits attached to his Objections.

Petitioner's Exhibits D, E, and F are items obtained by Petitioner in discovery in his civil case against Dayton Police Officers Orndorff and Carlson. D purports to be page four from the Use of Force investigation which is incomplete and unauthenticated; nevertheless, it is not exculpatory of Petitioner, except that it shows the Dayton Officers thought he was Plessinger when they

attempted to stop him, knowing that a warrant was outstanding for Plessinger's arrest and Plessinger was known to "hang out" in the area where the arrest was made. Even without the misidentification, there was clearly probable cause to arrest Armstrong because he was then wanted on a parole violation warrant. Exhibit E is a wanted poster for Plessinger which adds nothing probative to the probable cause to arrest Plessinger of which Petitioner was fully aware at the time of his trial. Exhibit F is an incident report on the arrest of Armstrong by Orndorff and Carlson which also is not probative of innocence.

Petitioner's Exhibits M and N are two of four letters from Tina Farler which were attempted to be admitted in evidence at trial. They are therefore obviously not new evidence.

To explain how the referenced evidence shows he is actually innocent, Petitioner repeats his conspiracy theory but draws into it Dayton homicide detective Dunsky, Assistant Montgomery County Prosecutor Karen Wolff, and her father-in-law, Second District Court of Appeals Judge William H. Wolff, Jr.[4], and some unknown assignment person in the Montgomery County Common Pleas Court who "mysteriously, through political subterfuge" transferred the case from Judge Froelich "who has the reputation of being honorable in every sense of the word" to Judge A.J. Wagner, who Petitioner alleges did not have jurisdiction to try the case.

As Petitioner acknowledges, a habeas corpus judge deciding on whether a petitioner has satisfied the "actual innocence gateway" past procedural default must necessarily make credibility determinations. Petitioner's theory of a massive conspiracy by many different public officials to cover up whatever happened between him and Officers Orndorff and Carson[5]. For the reasons given

---

[4]Although Judge Wolff recused himself from the appeal, he allegedly "poisoned the atmosphere of the appellate court, making Petitioner's appeal an exercise in futility." (Objections, Doc. No. 52, at 71.)

[5] This officer is consistently referred to in the Objections as Officer "Carlson," which is the name used in the Use of Force Investigation Report. This officer was sued by Petitioner under the name

above in the analysis of facts, this conspiracy theory is not credible. The Court also notes that Petitioner's civil suit against Officers Orndorff and Carlson was dismissed with prejudice when Petitioner failed to respond to a properly filed summary judgment motion after discovery.

## Conclusion

Having considered Petitioner's Objections, the Magistrate Judge again respectfully recommends that the Second Amended Petition be dismissed with prejudice and Petitioner be denied a certificate of appealability and the privilege of appealing *in forma pauperis*.

November 17, 2008.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d

---

"C.J. Carson" in Case No. 3:03-cv-060.

435 (1985).